CLEVELAND TRUST CO. v. OSHER &
REISS, Inc.
No. 8321.

District Court, E. D. New York.
April 17, 1939.

Cooper, Kerr & Dunham, of New York City (Thomas J. Byrne, of New York City, and Bair & Freeman and W. P. Bair, all of Chicago, Ill., of counsel), for plaintiff.

Hyland R. Johns, of New York City, (Langdon Moore, of Chicago, Ill., of counsel), for defendant.

CAMPBELL, District Judge.

This is a suit for the alleged infringement of three patents relating to oil burner systems.

1. Reissued Patent No. Re. 17,405 to Lewis L. Scott, assignor by mesne assignments to Electrol Incorporated, for oil-burning heating system, reissued August 13th, 1939. Original No. 1,427,700 dated August 29th, 1922, filed April 30th, 1921, reissue filed January 15th, 1923. Claims 12, 14, 16, 17 and 21 of which are in issue.

2. Patent No. 1,579,497 to Loyd I. Aldrich, assignor to Hart Oil Burner Co., for safety control mechanism for electrically-controlled fuel-burning devices, granted April 6th, 1926, on an application filed September 19th, 1923. Claims 1, 2, 3, 4 and 5 of which are in issue.

3. Patent No. 1,602,175 to Lewis L. Scott for electric control system for fuel-oil burners, granted October 5th, 1926, on an application filed May 31st, 1924. Claims 2 and 6 of which are in issue.

Another Patent No. 1,379,008, to Albert B. Frenier, for temperature-producing mechanism and controlling means therefor, was set up in the bill as originally filed, but plaintiff does not rely on it and offered no evidence in support of it on the trial.

Defendant interposed an answer setting up the defenses of invalidity and non-infringement, and also pleaded two counterclaims.

The first counterclaim sets up a claim for a declaratory judgment holding the patents in suit invalid, including Frenier 1,379,008.

The second counterclaim sets up a claim for damages.

Plaintiff served a reply denying all of the allegations of the counterclaim relating to validity and denying that there is any statutory amount in issue or that there has been proper pleading thereof.

At the close of the taking of the testimony, defendant moved that in the event the court finds no infringement of the patents in suit, the defendant be allowed to dismiss its counterclaim as to validity, without prejudice.

At the close of the hearing, the defendant moved that it be allowed to dismiss its counterclaim for damages.

At the trial, defendant moved to dismiss as to the Aldrich Patent under Rule 41, 28 U.S.C.A. following section 723c.

The corporate organization of the parties and that defendant has its place of business in Brooklyn, New York, in this district, are admitted.

The title of the plaintiff to the patents in suit is admitted.

The nature of defendant's structure of which complaint is made and sale by the defendant, are stipulated.

This action is defended by the Mercoid Corporation of Chicago, manufacturer of controls used by the defendant in the oil burner installation complained of.

The patents in suit relate to oil burner systems.

Such systems were in use in commercial places where there was someone in charge of the burners, but in the early 1920's, a start was made in the development and manufacture of oil burners for domestic use. The leading makers in 1925, were, Electrol, NoKol, and Williams Oil-O-Matic, and there were other smaller ones.

The Electrol business was based on the Scott patents and in 1924 the Hart Oil Burner became recognized, based on the Aldrich patent in suit.

The business grew, and by 1933 approximately 89,000 such oil burners were sold of which 49,000 were licensed under the patents in suit, and in 1936, 224,000 oil burners were sold of which 214,000 were licensed under the patents in suit.

In the successful manufacture and sale of oil burners for use in the home there were involved important problems with which the makers of coal-burning furnaces had not been faced. There being no constant attendant in the home for an oil burner, such systems must be entirely automatic, so that it will stop and start and furnish the desired heat for normal operation where the family is at home, or away for the week-end.

There must also be made adequate provisions for safety. Raw oil cannot be permitted to run into the furnace, as it may become a fire hazard and flood the basement, and if ignition of the oil supplied to the burner does not occur, and later ignition does occur, it may result in an explosion.

There must be ignition means in an automatic system.

If the room thermostat calls for heat, and the igniter does not work, there is initial flame failure.

The igniter may fail for a variety of reasons, among which, where spark plugs are used, they may carbon up, as in an automobile.

Failure of combustion may be caused by a slug of water in the oil, or dirt in the spray nozzle. Also, combustion may be prevented or interrupted by a back draft.

Combustion, after it has been established, may sometimes fail for some reason, and there will be subsequent combustion failure.

It is thus apparent that a safety apparatus must be provided for shutting down the system for the protection of the house, in the event of either initial or subsequent combustion failure.

It is for the accomplishment of these purposes, that it is contended that the inventions of the patents in suit were designed.

### Scott—Reissue Patent No. 17,405

This patent shows much of the mechanism common to all of the oil burner systems here involved, and such an oil burner provides heat in a combustion chamber of a furnace for heating air, steam or water, and also includes means for supplying air to support combustion, an electric motor for operating the oil and the air supplying means, an ignition device, and a room thermostat associated with the motor to supply means to stop and start it according to room temperature.

Exhibit 13 shows the conventional parts of an oil burner and the particular mechanisms illustrated in this Scott Reissue Patent. The burner nozzle is marked 11. Oil is supplied from the pipe 34 to the pump 33 and thence to the nozzle 11. Air is supplied from a blower 30 and the blower and pump are operated by a motor 31. The ignition is shown at 8, and the room thermostat at 114.

In some form or another, these parts are common to all of the oil burner systems here involved, and are arranged by Scott with other parts for electrical operation of the system, in a combination, which affords automatic operation and protection in the event of combustion failure.

The Scott Reissue Patent 17,405 is not a pioneer patent, as many of the elements found in this patent had been used in

prior patents for oil burners used in commercial establishments, but not in the same combination as are found in this patent, the invention of which broadly combines an electrically operated, automatic oil burner system, having a motor and a blower for projecting fuel into the zone of ignition, and then also, ignition means, a high voltage motor circuit, a low voltage safety control circuit derived from the same source as the high voltage circuit through a step-down transformer, the low voltage circuit including an electrically-controlled relay device for making and breaking the motor circuit, and a safety device directly responsive to combustion conditions in the furnace, which operates to shut down the burner, from initial or subsequent failure of combustion.

In claim 17 the safety means includes also a device (40) brought into action when the motor circuit is closed.

In claim 21 the combination requires that the thermostat combustion switch 9 be so located, that when the burner stops, cold air from the room will be drawn over the thermostatic element thereof, due to the natural draft of the furnace to cause the switch to quickly assume its "cold" position.

In normal operation of the Scott Reissue Patent No. 17,405, as shown in Exhibit 13, the primary source of high voltage electrical energy is the ordinary electric wires. The circuit, which furnishes the electrical energy to the system, includes a transformer primary, and a safety switch 96–100, which is latched closed when the room cools off, and heat is needed, the room thermostat 114 closes "cold" on the adjacent contact. This closes a low voltage circuit through the transformer secondary and magnet coil B, sometimes called the "On Coil". When coil B is energized, it attracts the arm 50, which then moves.

One effect of this movement of the arm 50 is to raise the switch member above the coil B to break the circuit through the coil B.

Another effect of this movement of the arm 50, and the consequent raising of the switch member above the coil B, is to close the ignition switch. Thereupon, a circuit is closed from the right-hand end of the transformer secondary through the ignition switch, thence through a primary ignition coil, and thence through the contacts 41 and 40, to the left-hand side of the transformer secondary, the primary ignition coil being energized causes energization of the ignition secondary coil and thus a circuit is established to the ignition spark plug 8.

Another effect of the movement of the arm 50 is to allow the motor switch above the coil A to drop to circuit closing position, whereupon a circuit is closed from the upper main supply wire through the motor switch, thence through the motor and thence through the safety switch to the lower main supply wire.

When the motor circuit is thus closed, the motor operates the pump 33 and the blower 30 for pumping oil to the nozzle 11 and supplying a blast of air to the nozzle. The combustible fuel mixture is ignited by the spark plug. The heat resulting from the ignition of the combustible mixture causes the thermostatic combustion switch 9 to move from its closed position to open position.

A device is shown which functions as an ignition cutout and also to hold open the circuit to the safety switch until the combustion switch has opened, and then closes contacts 40–42 to put that circuit in condition to function if combustion failure occurs. A Bourdon tube is connected by a suitable pipe to the oil fuel line, leading from the pump 33. When the motor and the pump begin operation, oil is forced into the Bourdon tube, causing it to expand. As it expands, the pin 39 lifts the contact 40 away from the contact 41 to break the ignition circuit.

The further expansion of the Bourdon tube causes the contact 40 to move upwardly into engagement with a contact 42, which is connected to the combustion switch at 25. The contacts 40 and 42 remain closed during further normal operation of the burner.

When the room reaches the desired temperature, the room thermostat moves from its position to the "Hot" position, and thus closes the circuit from the left-hand end of the transformer secondary through the room thermostat, through the switch, 83, thence through the relay coil A, and back to the right-hand end of the transformer secondary.

Energizing of the coil A attracts the arm 50 from its position, toward the right to open the motor switch and also the switch, 83, whereupon the motor circuit and the circuit through the relay A are

broken, and the parts assume a new position. Thereafter, the contact 40 drops away from the contact 42 and into engagement with the contact 41, because when the motor and the pump stop, the oil pressure is reduced, and the Bourdon tube moves toward its normal position. Also, upon shutting down of the burner, the combustion switch 9 cools and moves from its "Hot" position, to its "Cold" closed position.

Scott, in his combination, has provided mechanism which is placed on guard whenever the room thermostat calls for heat and starts the burner motor, and you either do or do not get combustion. If you get combustion, you do not want the safety mechanism to operate until the system has had a chance to start the burner and get combustion under way. In Scott Reissue Patent No. 17,405, as soon as the motor starts, the delayed action device is brought into operation to close the contacts 40 and 42 in the safety circuit after a time interval, sufficient to allow the combustion switch to open, if combustion is established.

If combustion does not occur, the combustion switch remains closed and the closing of the contacts 40 and 42 completes the safety circuit through the transformer primary, the combustion switch and the safety switch magnet. Energization of the magnet opens the switch 96–100 and breaks the circuit to the motor and the transformer primary, shutting down the system. Whatever be the demand for heat, the burner cannot operate until the safety switch is manually reclosed. An open safety switch gives notice that the system should be checked, to determine what caused the safety shut down.

Should combustion failure occur, after combustion has once been established, and while the room thermostat is still calling for heat, the combustion switch will close, due to the drop in temperature, and thus complete the safety circuit, causing the safety switch to open, as in the case of initial combustion failure.

In Scott Reissue Patent No. 17,405, there is provided an organization of parts wherein the room thermostat and the electrically-operated means for making and breaking the motor circuit for normal operation, to wit the coils B and A and associated parts, and the safety switch magnet and the combustion switch and the contacts 40–43 are all in low voltage circuits.

From these low voltage circuits flow many advantages.

The contacts of the switches of these circuits are not subject to arching and pitting, as in high voltage circuits, with a consequent lengthening of the life of the parts and greater certainty of operation. The switches may be simple and less expensive. The room thermostat requires less power for its operation and can be made smaller than one of high voltage and is safer from the standpoint of electrical shock and other hazards inherent in high voltage wiring.

■ Defendant offered in evidence, as prior art, a number of United States patents and a British patent.

In no single patent so offered is there found the combination of any of the three patents in suit upon which plaintiff relies. The most that can be said is that defendant has picked out one element here and one element there in the patents so offered in evidence and therefore none of the patents so offered in evidence by the defendant anticipates any of the three patents in suit upon which plaintiff relies. Ottumwa Box Car Loader Co. v. Christy Box Car Loader Co., 8 Cir., 215 F. 362, 364, 369.

As I understand the defense of invalidity, it is that there was no invention over the prior art in the said three patents in suit, and that the art left no room for invention in the said patents in suit.

The defendant also offered in evidence certain alleged prior uses.

I will now consider the alleged prior art patents and prior uses so offered in evidence with reference to Reissue Patent 17,405, in suit.

Patent No. 489,052 to Joseph E. Watts, for apparatus for regulating temperature, granted January 3rd, 1893. That patent relates to a coal-burning furnace. It discloses a damper door on a furnace operated from a water motor 6, started and stopped by an electro magnet 16, which is energized and de-energized by the closing and opening of a room thermostat D arranged in circuit with a battery 18. When the room thermostat calls for heat, the magnet 16 is energized to operate a valve mechanism to let water out of the motor 6. Thereupon the weighted arm 4 is lowered and the damper is opened.

When the room warms up and the thermostat opens and breaks the circuit to the electro magnet, the valves operate to admit water to the motor 6 and the damper is closed. There is also disclosed a means for shunting the circuit away from the electro magnet in case excessive heat should develop in the boiler. It actually short circuits the battery and when closed would promptly run the battery down. A thermostat F is mounted outside of the "heating source". While that thermostat is not very fully described, the patentee says the expansion tube 24 thereof is connected to a pivoted lever 25, which controls the contacts, which when closed shunt out the electro magnet.

I find that but very little of the combination of Patent Re. 17,405 in Watts. As I understand it, defendant offered that patent to show that even though a room thermostat of Watts be closed, calling for heat, the by-passing of current about the magnet will prevent the continued operation of the fire at full capacity when there is an overheated condition.

The problem, Watts faced, was not the problem faced and worked out by Scott.

Watts faced no problem of combustion failure and protection against it. His safety device is for protection against excessively high temperature in the furnace.

Scott, on the other hand, solved the problem that confronted him, by providing safety mechanism, the primary purpose of which was to shut down the furnace and avoid danger of flooding, explosion and operating motor without fuel. Scott also provided for the operation of a motor with a high voltage current and controlling the motor switch by safety mechanism with a low voltage current all from the same source of electricity. Watts' system placed in an oil burner would furnish no protection against combustion failure.

Patent No. 1,117,652 to Milton A. Fesler, for means for regulating centrifugal oil-burners, granted November 17th, 1914. That patent discloses an oil burner with a motor in a high voltage circuit, closed by a hand switch. It provides a stack thermostat for stopping the burner upon flame failure occurring after combustion has once been established, but does not provide protection against ignition combustion failure, which is probably the most common. It does not have an ignition device nor a room thermostat. The motor must be started by throwing a hand switch, and a match must be used every time it is desired to light the fire, to cause the furnace to operate. Defendant offered this patent because it contends it is an automatic control to prevent the delivery of a combustible mixture to the furnace in the event of failure of combustion in the combustion chamber of the furnace.

Compared with Scott, Fesler is not an automatic system for the reasons hereinbefore stated. It discloses no use of low voltage circuits and has no delayed action device, and if put into an automatic system it would afford no protection against combustion failure occurring after combustion had started, but before the knob 29 had traveled upwardly and cleared the wall 36. It does not disclose any way in which the thermostat would be subject to cool air from the room when the burner stops, as called for by claim 21 of the patent in suit Re. 17,405.

Patent No. 1,131,683 to John A. Doble, for automatic fuel control system for boilers, granted March 16th, 1915. That patent discloses an oil burner for heating water for steam-driven automobiles. Fuel is supplied through a pipe 14 to a center of a fan 15, operated from an electric motor 6, and is there mixed with air, and the mixture is blown through a pipe 13 to the burner 12. When the motor circuit is closed by the hand switch 31, an ignition circuit is closed from the wire 28 through the wire 38, interrupter 23–37, the transformer 20, and a circuit is provided from the transformer to the spark plugs 19. It also provides for controlling the motor speed according to the pressure in the boiler, for thereby regulating the supply of fuel to the burner, as in that patent the ignition will continue to operate so long as the current is being supplied to the motor, but the operation of the motor will be automatically varied by the pressure regulator 35 to the point where the motor circuit is entirely interrupted in the event of excessive pressure in the boiler. It also provides for a high temperature limit control for breaking the motor circuit, if the temperature of the boiler gets too high, as the thermostat shown at 33 acting upon the switch 32, will automatically interrupt the motor circuit in the event of development of excessive temperature in the boiler. That patent does not provide any protection against combustion failure, nor against flame failure, initial or subsequent. It does not even suggest the Scott arrangement of a motor in a

high voltage circuit, and an electrically-controlled device in a low voltage circuit, and a combustion switch to break the motor circuit. It has nothing like the combination of claim 17 of Patent Re. 17,405 in suit, and nothing that corresponds to the arrangement of claim 21 of that patent in suit, whereby the thermostat would be subjected to cool air from the room when the burner stops.

Doble does not suggest mechanism whereby the Scott result could be attained, and it seems to me that defendant's only purpose in introducing that patent was to show that there were controls of some kinds for oil burners in 1915.

Patent No. 1,183,786 to George A. Welch, for safety cut-off device for fuel-oil burners, granted May 16th, 1916. That patent discloses a motor 5 actuating a fuel pump 9 for delivering a combustible mixture to the burner, 1. It further shows in the motor circuit, a knife switch 20–21. In the case of combustion failure, the oil which has collected in the gutter 11 flows into a drip bucket or pan 24, and the weight ultimately opens the knife switch for breaking the motor circuit. That patent like all drip bucket devices relies on flooding the combustion chambers with raw fuel before the drip bucket works, which is exactly what Scott designs to prevent. The Welch patent does not disclose an automatic system, as an attendant must stop and start the motor, and must light the fire with a match. It discloses no room thermostat, no ignition, no transformer, no relay and no switch subject to combustion conditions, and no low voltage and high voltage arrangement.

Patent No. 1,332,615 to John A. Doble, assignor to Doble Laboratories, for fuel-burner control, granted March 2nd, 1920. That patent discloses a device for controlling the flow of fuel to an oil burner used for heating water, particularly for steam-driven vehicles. The purpose of the invention being to provide means for controlling the flow of fuel to the burner according to temperature and pressure within the boiler. A motor 4 operates a pump 12 for supplying fuel to the burner 2. The motor is operated from a battery 27. An ignition system is energized upon closing the motor circuit. In the fuel oil supply line is a valve 9 controlled by a solenoid included in the motor circuit to open the valve when the motor circuit is closed. Switch contacts 22–23 are normally closed, but upon excessive pressure or boiler temperature, either, or both, will open and break the motor circuit. In that patent there is no provision against combustion failure. The device could not be used in connection with a domestic oil burner and it does not have Scott's arrangement of parts in high and low voltage circuits. It is unnecessary to repeat what I said in distinguishing Doble Patent No. 1,131,683 from Scott Patent Re. 17,405, practically all of which is applicable.

Patent No. 1,359,042 to William A. Doble and John A. Doble, assignors to Doble Laboratories, for fuel-control system for boilers, granted November 16th, 1920. That patent discloses a fuel control for heaters for boilers for automobiles, and the patent also says that it might be used in a house heating system. The arrangement of that system is generally like that of the two former Doble patents. That patent was considered by the Patent Office during the prosecution of the Scott application for Re. 17,405, in suit. In that Doble patent, the speed of the motor which supplies air, and thus controls the fuel supply, is regulated in two ways, by a rheostat 28 according to boiler pressure and by a rheostat 35 according to boiler temperature. It is unnecessary to repeat what I said in distinguishing the two former Doble patents from Reissue Patent 17,405 in suit, as substantially all of it is applicable here.

Patent No. 1,371,231 to Sterling Elliott for controlling means for centrifugal oil-burners, granted March 15, 1921. That patent discloses an oil burner furnace for domestic purposes. A motor 11 operates a pump 10 for supplying oil to the burner and rotating an oil distributor 4. When the room thermostat (51) calls for heat, it closes a circuit through a magnet 49, which then releases the latch 47 of a clockwork mechanism, which makes a half turn and closes the switch 41–42 in the motor circuit, and also breaks the circuit that has been closed through the room thermostat and the battery 50, which are entirely independent of the motor circuit. On the room warming up, the room thermostat moves over to engage the contact 53, the magnet 49 is again energized to release the latch 47 momentarily, and another half revolution of the clockwork occurs, which opens the motor circuit and likewise opens the thermostat circuit. That patent also provides a drip bucket motor circuit cutout substantially similar to that

of Welch 1,183,786. The thermostatic device provided by Elliott for regulating fuel flow, according to stack temperature, is not a safety device for protecting against combustion failure. When the stack temperature is cold, the thermostatic rod 72 is in such position that the fuel control valve 65 is nearest to wide open. When the stack gets hot the thermostatic rod 72 operates the lever 81 and the lever 67 for moving the valve 65 toward closed position for thus reducing the supply of fuel. Elliott's thermostatic rod 72 is not a safety device. Elliott shows a motor in a high voltage circuit and a room thermostat and the magnet 49 in a separate battery operated circuit, which, even if it be, as defendant's expert calls it, a local low voltage circuit, is not the arrangement of the patent in suit Re. 17,405. In that patent in suit the low voltage circuits are supplied from the main high voltage line, low voltage being afforded as long as high voltage is available, whereas Elliott's batteries would have to be replaced from time to time. Elliott does not show a combustion switch in low voltage circuit for effecting the opening of a switch in a high voltage circuit, as called for in the claims of the patent in suit Re. 17,405. Elliott's patent shows that others skilled in the art were attempting to secure safety, approximately at the time Scott was developing his safety system, by combinations which lacked the completeness of automatic control and certainty of safety of the Scott system.

Patent No. 1,523,564 to John A. Sherman and William H. Sheppard, for heating plant, granted January 20th, 1925. That patent shows a room thermostat H, and when it calls for heat, a circuit is closed from the main line through the thermostat H, wire 21, time switch 13 and electro magnet 23. This is a high voltage circuit. Energizing the magnet 23 pulls the arm 18 from its dotted line position of Figure 3 to its full line position, where it engages with latch arm 171. The circuit is then established from the main line wire, through wire 1, motor G, wire 2, bracket 3, spring 19, armature 18, latch 171, wire 4, safety switch K, and high pressure cutout switch 81. When the room thermostat is satisfied and it engages contact 11, a circuit is established through coil 15 of the magnetic relay J, whereby the latch arm 171 is operated to release the armature 18, whereupon the spring 19 pushes the armature 18, and the motor circuit is broken. There is also provided a high limit safety

device indicated at M and 81 which breaks the motor circuit upon excessive pressure in the boiler, which has no relation to combustion failure, except that upon cooling down of the furnace, it returns to its closed position. There is also provided a cutout arrangement. At K is shown a switch in the main motor circuit which circuit comes through the line 4 to the fixed contact K1, thence through the movable contact 5 and its bracket to the wire 6. A magnet 32 when energized pulls the latch arm 34 down to clear the arm 35 and thereupon the spring K2 will pull the arm 35 to the left, and the rod 351 will push the contact 5 open. Normally this switch is closed and does not effect the motor circuit in the normal operation of the burner. The magnet 32 is in a high voltage safety circuit which is entirely independent of the motor circuit and the room thermostat circuits. In this safety circuit, on the front of the furnace, is a thermostat P, normally closed when cold and at 29 and 30 are contact points, the point 30 being controlled by the movable end of a cylinder Q and when the system is not operating, contacts 29–30 are open, thus the circuit to the magnet 32 is normally open. Defendant's theory of that patent is, that if there was combustion failure at the beginning of the operation the contacts 26, 27 would be closed and then as soon as the contacts 29, 30 closed the magnet 32 would be energized and the safety switch K opened. It does not seem necessary to go into a discussion as to whether that patent discloses a pilot controlled safety instead of a combustion controlled, but, in passing I would say that on reading that patent without knowledge of Scott Re. 17,405 in suit, I would lean to the belief that it disclosed a pilot controlled safety. I find nothing in the specification that supports defendant's expert in his belief that the thermostat P in the Sherman and Sheppard patents is a disc, but if it be it will take a much longer time to operate it which is undesirable. Assuming that as contended by defendant, the thermostat P is responsive to heat in the furnace, you would not have the directly and accurately responsive protective system of the Scott Patent Re. 17,405 in suit. Sherman and Sheppard do not disclose the high-low voltage arrangement of said Scott Reissue patent, nor do they have the relay in a low voltage circuit of the said Scott Reissue patent for operating a switch in a high voltage circuit. In Sherman and Sheppard, the room thermostat and the re-

lay magnets 23, 15 are in a high voltage circuit and must be rugged to stand high voltage current.

Sherman and Sheppard did not disclose the invention of Scott.

The defendant also offered in evidence in support of its defense of prior use, depositions of witnesses taken at Worcester, Massachusetts, relating to certain alleged installations made by Sherman and Sheppard, patentees of patent No. 1,523,564, of a device like that of that patent having a peculiar kind of combustion thermostat, differing from the thermostat shown in that patent, but the difference is not pertinent to the Scott Patent Re. 17,405 in suit. Repetition is unnecessary as what I have said about the Sherman and Sheppard patent No. 1,523,564 as a reference applies to the alleged prior use.

Patent No. 1,441,928 to John H. Hunt, assignor to The Dayton Engineering Laboratories Company, for system of control for electrical devices, granted January 9th, 1923. That patent relates to devices for heating water for domestic purposes. It shows a fire tube or burner 23 to which oil is supplied through a pipe 34 and a spark plug ignition 40. A blast of air is delivered to the burner from the blower 30, operated by a motor 31. When the user wants hot water, he closes the convenient switch 51–59, which closes a circuit through the motor 31, as well as the ignition circuit to the spark plug, whereupon the blower is operated, the fuel supplied and ignited, and the water warmed by the heat in the jacket 24 may be drawn off through the faucets 27 or 28. Hunt provides a protective device which need not be described as it is to afford protection against excessive heat in the water jacket. If the water becomes too hot, the circuit is cut off so that it will have to be manually closed, or will operate to break the circuit only temporarily, and when the temperature in the water jacket goes down, the Sylphon bellows again closes the motor circuit. Hunt compared with Re. 17,405 has merely a high temperature cut-out. His system is not, as compared with Scott, automatic, as it has to be started and stopped for normal operation manually, and furnishes no protection against combustion failure. Hunt does not even suggest Scott's high-low voltage arrangement.

Patent No. 1,320,936 to Lewis L. Scott, assignor to Standard Engineering Company, for safety device for combustion system, granted November 4th, 1919. That patent is similar to Sherman and Sheppard Patent No. 1,523,564, and was a file wrapper reference during the prosecution in the Patent Office of the Scott Reissue 17,405. It shows two systems, one in Figure 1 and one in Figure 3, and so far as the room thermostat and safety devices are concerned, both systems show an all high voltage control system, the ignition being supplied from a battery. In the form shown in Figure 1, the fuel pump 9 and the blower 4 are operated from a motor 10 in a high voltage circuit with the room thermostat 32 which closes when calling for heat and the motor is started. Oil is pumped into a Bourdon tube 18, effecting first to close the ignition circuit, by allowing the arm 22 to rock until it engages the contact 28. Oil is supplied to the burner and a further movement of the Bourdon tube causes a rocking of the arm 20 and a breaking of the ignition circuit at the point 30. When the room thermostat is satisfied, the circuit to the motor is broken and the Bourdon tube then acts to rock the arm 20 and lift the contact 51, and the diaphragm being relieved of pressure, rocks arm 39 to move contact 51 toward, but not to the contact 52.

In the form of the device of Figure 3, instead of a Bourdon tube, that patent discloses a dash pot type solenoid 65. Instead of the diaphragm 48, 49 he shows a diaphragm 55, 56 which is presumed to be controlled by a mercury type thermostat 54 which that patent says is projected into the draft pipe, but his shows as projecting into the boiler riser pipe. When the room thermostat calls for heat, it closes a circuit from the room thermostat through the safety switch 42, 43, and the motor. A circuit is also, closed through the coil 64 of the solenoid 65. When the room thermostat is satisfied, the solenoid is de-energized and the post 71 lowers. The point 73 is also lowered, but the parts are timed, so that these contacts do not engage.

On subsequent combustion failure, the contact 73 lowers to engage 71 to effect the opening of 42–43.

That patent does not have the combination of the high voltage circuit to the motor and the low voltage circuit taken from the high voltage lines, nor the magnet in the low voltage circuit for controlling the motor switch in the high voltage circuit, nor the combustion switch in the low voltage circuit to effect energization

994

of the safety switch magnet on combustion failure.

The Scott Reissue No. 17,405 states that it is an improvement on No. 1,320,936 and it is, and was thought by the Patent Office to involve invention over this reissue patent.

Patent No. 1,410,909 to George W. Garvey for stove and furnace, granted March 28th, 1922. That patent discloses, without much detail, a simple oil burner system. A motor 16, the motor circuit not being completely shown, drives a blower 12. It shows wires leading from the motor to contacts 20 and 21 and a contact piece for bridging them, without showing any connection to a source of supply. The patentee says the motor is connected to a generator 19, but no such connection is shown, and I do not see how such connection could be made, without interfering with the shutoff device. It also discloses a motor cut out of the drip bucket type. When the float 30 is low or in normal position, a circuit is closed through the solenoid 11, which is energized from the battery 19 for holding open the valve 9 in the oil supply line, while the thermostat calls for heat.

As I understand the patent, if combustion failure occurs, the oil flows back through the pipe 24 to the float valve, raising the float and opening the contacts at 25, 26 and 27, thus de-energizing the solenoid 11 and permitting the valve 9 to close and the motor circuit to be broken at 20, 21, 22. Doubtful as it is whether Hunt's drip bucket type of cut out will work, even if it does, it is not more pertinent to Scott Re. 17,405 than Welch 1,183,786. That patent shows no thermostatic device subject to combustion conditions, no ignition nor anything that is comparable with Scott's high and low voltage arrangement.

Patent No. 1,432,464 to Era C. Jacobsen, assignor by mesne assignments to American Steam Truck Company, for fuel burning apparatus, granted October 17th, 1922. That patent shows an oil burner intended for use with automobiles. It shows a motor 5, a blower 4 and a fuel supply line 10, for delivering combustible mixture to a combustion chamber, and a spark plug ignition 61. When the fuel valve 37 is opened manually, an ignition circuit is closed and the oil, under pressure, opens a ball valve 22. When oil flows to the burner, it also flows to the Bourdon tube 30, which functions to interrupt the ignition circuit and then close the motor circuit.

There is provided a diaphragm pressure regulator 25 acted on by boiler pressure for closing the fuel supply valve in case of excessive pressure in the boiler.

There is another limit control, but it does not afford any protection against the hazards of combustion failure. The system has to be started and stopped, manually.

Nothing is shown that corresponds to automatic intermittent operation according to temperature in a room. The patent does not show any room thermostat nor room thermostat control, nor arrangement of a motor in a high voltage circuit and safety controls in a low voltage circuit.

Patent No. 1,393,564 to Nathaniel B. Wales, assignor by mesne assignments, to the Wales Company, for automatic heating system, granted October 11th, 1921. That patent shows an automatic house heating system. A motor 9 is operated from an alternating current 70, and shows a transformer 71, a room thermostat 44–49, a pilot thermostat 35 and an electro magnet 43' in a low voltage circuit. It also shows two bimetal thermostats, each heated by a pilot and held closed thereby. One for use with one kind of fuel, and the other for another kind of fuel, only one being used at a time, therefore, only one need be considered.

When the room thermostat closes the magnet operates the relay switch 43, and closes the motor circuit. When the room thermostat is satisfied, it breaks the circuit through the magnet and the switch 43 opens for breaking the motor circuit. It also discloses a limit control shown at 12, 31, 48 which breaks the circuit to the magnet 43' in case of excessive heat in the boiler.

As I understand that patent, if the pilot light goes out, the switch 35, which is normally held closed by the heat of the pilot, will cool down and open and thus break the circuit to the magnet 43'.

If that patent has combustion failure, whether initial or subsequent, but the pilot light stays on, the burner will continue to run and throw oil into the furnace as long as the thermostat calls for heat and, therefore, affords no true protection against combustion failure.

Wales does not show the arrangement of the thermostatic switch directly subject to combustion conditions in the furnace, so that upon failure of combustion in the furnace, the system will not be flooded with oil, neither does he show anything to

correspond to the delayed action device in the combination of claim 17 of Re. 17,405, nor has he anything to correspond to the arrangement whereby, upon stopping of the burner, the thermostat will be quickly cooled down by air drawn in from the room by natural draft of the furnace, as shown in Claim 21 of Re. 17,405.

It is true that upon the normal stopping of the furnace in Wales, air may be drawn in around the thermostatic bar 35, but that bar will not be cooled to effect its functioning, because in that system the pilot keeps it warm.

There is no need for discussing the patent to Haas No. 1,476,201 nor the British Patent to Jeidel 3818 A. D. 1914, with reference to Re. 17,405 for the reason that Haas' Patent was filed June 16th, 1922, too late to be pertinent, and Jeidel's Patent is obviously urged only as against the Aldrich Patent in suit.

Consideration of the prior art clearly shows that none of the patents nor the alleged prior use anticipates the patent in suit Re. 17,405.

The two closest patents, Scott No. 1,320,936 and Frenier No. 1,379,008 were considered as references by the Patent Office in the prosecution of the Scott patent in suit Re. 17,405 and it issued over them. The Elliott patent No. 1,371,231 is no better as a reference against Patent Re. 17,405 than is Frenier No. 1,379,008.

It is true as shown by the patents of the prior art in evidence herein, that many of the elements of the Patent Re. 17,405 in suit, are old, but they were not shown in the same combination as in the Patent Re. 17,405 in suit.

This was a progressive art and the patent in suit Re. 17,405 represented a substantial advance in the art. Many inventors were working on the problem and yet none of them found the combination of the said patent in suit.

The problem which Scott in Re. 17,405 successfully solved, was organizing and arranging all of the parts so as to give automatic operation and maximum protection, with the safety device in the low voltage circuit.

■ The Scott patent in suit Re. 17,405 is valid and represents substantial invention over the prior art.

### Aldrich Patent No. 1,579,497

The problem which confronted Aldrich, and which he solved, was to provide an arrangement which would cause operation of a combustion switch at entirely different temperatures upon combustion temperature rise and combustion temperature fall. These temperatures are of relatively small value above and below that temperature at which the rise or fall commenced. In the prior art, however, the devices always had to operate at exactly the same temperature on rise and fall.

The Aldrich patent in suit shows a motor 10, a blower 12, a pipe 15 conducting fuel to the nozzle 17 and an ignition device at 17a. It also shows a main line circuit through a transformer primary and through a safety switch. In normal operation when the room thermostat closes calling for heat, a circuit is established from the transformer secondary through the room thermostat, the coil 21b of a solenoid and through the combustion switch which is normally closed. The energization of the solenoid coil 21b raises the contact 70 from its position to its raised position where it engages contact 71 and closes a circuit from a main line through the switch 71, 70, the motor, safety switch and back to the main line.

The establishment of combustion heats and expands the brass tube 37, (In the specification, this is the tube 24 with an end 37). Thereupon, the carbon cylinder 25 moves to the left and the spring 33 pushes the rod 30 to the left. On the rod 30 is the frictionally mounted sleeve 36 which travels with that rod until it engages a frame member. Such movement is sufficient to carry the spring 38 over center and to cause the moveable contact member to be snapped away from the fixed contact for breaking the circuit.

A further increase in temperature of combustion causes further expansion of tube 37, and movement of carbon rod 25 to the right. The rod 30 is caused to follow such movement by action of the spring 33 but the sleeve 36 can move no further to the left, because of its engagement with the frame of the switch mechanism. The slip connection between the rod 30 and sleeve 36 permits this continued movement of the rod 30.

The burner operates until the room thermostat is satisfied, and moves to its "Hot" position, and closes a circuit from the transformer secondary through the room thermostat, the solenoid coil 21c which raises the plunger 49 for raising the bar which carries the contact 70 and the contact 50. The bar moves and the contacts

70 and 71 are separated to break the circuit to the motor, and the contacts 55, 56 are separated to break the room thermostat "Hot" circuit.

The combustion thermostat will now cool and do so since combustion has ceased due to stopping of the burner motor. Brass tube 37 begins to contract and its left end moves to the right, causing the carbon rod 25 to likewise move to the right. This movement is transmitted to rod 30 through lever 28. Initial movement of rod 30 will carry sleeve 36 with it toward the right and, after a short time, spring 38 will again pass over center and snap the combustion switch closed. Further contraction of brass tube 37, due to further temperature of decrease, will move sleeve 36 into engagement with the frame of the switching mechanism and thereafter the sleeve 36 will remain stationary, but the rod 30 will continue its movement to the right, such movement being permitted by the slip connection between rod 30 and sleeve 36.

This is the operation of Aldrich upon a subsequent combustion failure. Assuming that the room thermostat has called for heat and that normal running conditions exist. The combustion switch is open. Then subsequent combustion failure occurs. The brass tube 37 contracts. It pushes the lever 28 to the right carrying with it the sleeve 36 and swinging the spring 28 over center to cause the contacts of the combustion switch to engage. A circuit is then established through the coil 20b and the heating of that coil warps the bimetal thermal member in the coil 48, causing it to close the circuit through coil 20a which opens the safety switch as explained in the foregoing description of the operation upon initial combustion failure.

Uncertainty existed in the prior art patents wherein the thermal device operated at a definite temperature, and might require change of 50° at one time and 400° at another time to cause it to operate, whereas in the Aldrich patent, uncertainty is removed by setting it to operate at a definite change and if that be 50° it will always operate upon a change of 50° and operate upon substantially immediately upon initial movement of the thermal member in either direction.

The provision of an oil burner system in which such safety mechanism permitted short trial ignition periods for initial establishment of combustion, and also insured quick stopping of the burner upon subsequent combustion failure was new with Aldrich.

I will now consider the prior patents offered by the defendant in relation to the Aldrich patent No. 1,579,497 in suit.

Watts Patent No. 489,052. That patent does not show a similar combination, but it does show a thermostat F, which operates only upon excessive heat in the boiler and affords no protection against combustion failure. Its thermostat opens and closes at the same temperature and has nothing related to the slip connection of Aldrich.

Fesler Patent No. 1,117,652. That patent does not disclose a combination like that of Aldrich, and does not afford protection against initial combustion failure for the reason that, if combustion does not occur, when the motor starts, the thermal device of Fesler has no effect for stopping the motor, but the same must be manually stopped. The effect afforded by Fesler against combustion failure subsequently occurring, is only partial. In Fesler the movement of the contact knob 29 when it moves from cold position to hot position, makes no contact, and has no effect upon any circuit, whereas in Aldrich, the device always makes a contact upon movement of the thermal member in one direction and also breaks a contact upon movement of the thermal member in the other direction.

In Fesler, movement of the thermal member on heating has no controlling effect, and on cooling first closes the circuit and then on further cooling, reopens it. Fesler, on cooling, does not insure closing of the circuit substantially immediately after the movement of the thermal member begins, but his thermal member always moves to circuit closing position, at the same temperature, thus the time required to close the circuit varies according to how highly the thermal member has been heated, and if it has not been heated highly enough, it never does close the circuit on cooling.

In Aldrich, however, the movement of the thermal member in either direction actuates the switch substantially immediately to a new circuit controlling position.

Doble patents Nos. 1,131,683–1,332,615 and 1,359,042. These patents do not afford protection against combustion failure as their protective features relate to means for shutting down a motor in case of excessively high temperature or high pressure.

Welch Patent No. 1,183,786. That patent does not provide a device of the Aldrich

type, there is no thermal member subject to combustion conditions. It discloses a drip bucket type of safety device.

Elliott Patent No. 1,371,231. That patent discloses a drip bucket type of safety. It has no thermal element subject to combustion conditions serving to control a safety switch but its thermal element 72 opens the fuel flow valve when it cools down and moves the fuel valve toward closed position, when it heats up, thus leaving it in a partially open normal flow condition when combustion is fully established. Aldrich's arrangement for closing down the motor promptly upon movement of a thermal member in either direction is not even suggested.

There is no operative connection between Elliott's thermal member 72 and his drip bucket safety cut out.

Hunt Patent No. 1,441,928. That patent shows a mechanism in connection with an electrically-controlled water heater, whereby the motor is shut off upon development of excessive heat in the water jacket. There is nothing responsive to combustion failure in that patent. Hunt does not say anything which indicates that his safety device would work upon combustion failure, and even if defendant's expert was correct in his thought of what might happen in case excessive temperature were developed and failure of combustion occured, it would not act for safety purposes upon combustion failure, because upon combustion failure temperature would go down. One of the chief purposes of Aldrich is protection against combustion failure, and Hunt discloses no means for protection against combustion failure, and Hunt provides nothing like Aldrich's thermal member for immediately operating contacts upon movement in either direction.

Scott Patent No. 1,320,936. That patent need not be discussed at length, because what I said about it, in comparing it with the Scott Re. 17,405 is applicable to a comparison with the Aldrich Patent. Aldrich differs from Scott No. 1,320,936 the same at it differs from Scott Re. 17,405 in that Scott provides his means for always operating his switch after differing temperature changes, whereas Aldrich operates his switch upon a given temperature change. The respective combinations are entirely different.

Garvey No. 1,410,909. That patent shows a safety device of the drip bucket type and has no thermal element subject to combustion conditions, which functions to operate a switch immediately upon movement in either direction, nor is there any suggestion of such an element or its effect in the system.

Jacobsen No. 1,432,464. That patent requires no extended discussion, as it does not even suggest the combination of Aldrich, including the thermal member for operating the switch substantially upon movement of the thermal member in either direction.

Wales No. 1,393,654. That patent discloses a pair of bimetal thermostats 35 and the one in use is subject to heat from a pilot. They do not operate substantially, immediately, and they operate always at the same temperature. Wales does not disclose the Aldrich combination.

Patent No. 1,476,201 issued to Paul C. Haas, assignor of one-half to Frank M. Kellogg, for burner igniter, granted December 4th, 1923. That patent was too late to be a reference, as to the Scott Re. Patent No. 17,405. Haas shows a bimetal thermostat 30 subject to combustion conditions, which is constantly in contact with another bimetal thermostat 29 during normal operation, which thermostat is subject to heat from a heater 35, when the room thermostat is calling for heat. The room thermostat closes when calling for heat and closes a circuit through the magnet 18 for closing the main motor circuit.

When the main motor circuit is closed, a circuit is also closed through the fixed contact 34 and the contact 39 on the thermal bar 29, and through the spark coil 38. The closing of the main motor circuit also closes a circuit through the heater 35. When the system starts up, the heater 35 tends to warp, the thermal bar 29, away from the contact 34 for breaking the ignition circuit, when the ignition is no longer needed. This warping also tends to move the thermal bar 29 away from the thermal bar 30, but if combustion is established, the heating of the thermal bar 30 causes it to follow the bar 29, so that in normal operation, the contact arc between the two thermal bars is not broken. In case combustion is not established, however, or in case combustion should subsequently fail, the thermal bar 30 will cool and warp away from the thermal bar 29, thus breaking the circuit through the magnet 18, whereupon the motor switch 19 will open and the motor will be stopped.

The structure of Haas is not anything like the Aldrich structure, and the protection furnished by Haas, either in normal or abnormal operation is not the kind of protection furnished by Aldrich.

■ British Patent No. 3,818 A.D. 1914, to Betty Jeidel, for improved thermal contact device for electric circuits, accepted June 4th, 1914. That patent shows a kind of device which, if enough be added to the disclosure thereof, might cause contacts to engage or disengage promptly upon movement of the thermal member in either direction. This is a foreign patent, the disclosure of which is very incomplete, and being a foreign patent, it may be considered only for what it discloses. Simplex Piston Ring Co. of America, Inc. v. Hamilton, D.C., 21 F.2d 196, at page 199; Permutit Co. v. Harvey Laundry Co. et. al., 2 Cir., 279 F. 713.

The patentee says her device is for use in connection with closed circuit systems for fire and temperature alarms. She also says that a tube b is slidably mounted on a magnesia rod a, and that a second tube d is likewise slidable upon a tube b, and that tube b carries a contact c and a stop g. The tube b also carriers a contact f located between the contact c and the stop g.

It does not appear that the tubes are slidably mounted, but if both were actually slidably mounted, the device would not work. Neither the drawing nor the specification of Jeidel shows any connection between the sleeve b and the rod a, although that patent says the lower end of the sleeve b must be connected to the column or stack a. Unless it has that connection, it will not work, and if, as the patentee describes, her device, the two sleeves are slidably mounted in the same way, there would be no connection at the lower end of the sleeve b.

Whether the disclosure of Jeidel be sufficient or insufficient, it does not show the combination of Aldrich for operating a switch in a safety circuit for closing the circuit when combustion occurs and opening the circuit when combustion ceases, so as to give protection upon either initial or subsequent combustion failure.

Sherman and Sheppard Patent No. 1,523,564. That patent does not provide an oil burner system in which protection is afforded against initial and subsequent combustion failure, by a combination including a combustion switch having a thermal member, so arranged as to substantially, immediately, close or open the contacts in a circuit at the beginning of the movement of the thermal member in either direction. Neither does Sherman and Sheppard provide means for always operating their switches upon a given temperature change, as does Aldrich.

Defendant's expert says that the Sherman and Sheppard patent shows a combustion thermostat P which has a slip connection somewhat like that of Aldrich, which would cause it to operate upon a given temperature change. He also says this is accomplished because Sherman and Sheppard's thermal member 26 is associated with a rotatable disc, so that when the thermal member moves from contact 27 to a stud on the disc, or vice versa, any further movement of the thermal member will carry the disc by rotary movement, and that the contacts will be closed or opened immediately upon movement of the thermal member in either direction.

I find nothing in that patent which supports that theory.

All that defendant's expert could find to indicate that this thermostat device includes a disc, is the circle.

Obviously, the circle could represent the whole combustion switch diagramatically the same as it does the room thermostat 8, in the same figure, or the room thermostat and the lower right hand thermostat in Figure 5. There is nothing to indicate that these circles indicate discs or that the discs are rotary, and the word "rotary", is not applied to the combustion switch anywhere in the specification, nor if there be a disc, is there any showing as to how it is mounted.

I cannot find that the patent shows a rotary disc and, therefore, the Sherman and Sheppard patent does not show the combination of Aldrich.

Sherman and Sheppard alleged prior use.

The defendant relys upon a system with a control which Mr. William H. Sheppard said was identically like Figure 1 of the patent.

Comparing the patent with the two forms of thermostats, Exhibits C and I, it clearly appears that the control used at Worcester, Massachusetts, could not have been like that shown in the patent.

The first of the Sherman and Sheppard burners was installed in W. H. Sheppard's home, and Mr. Sheppard says Exhibit C is from that installation.

Exhibit C was an experimental thermostat, made up of an oven thermostat, with some additions made by Sherman and Sheppard's mechanics.

Mr. Sheppard says that the installation with a device like Exhibit C was used from 1917 to 1921 in his home.

With the exception of Christian's obvious misstatement, the testimony does not show that any installation like Exhibit C was made anywhere, except at Mr. Sheppard's home. Mr. Sheppard says that devices like Exhibit C were used from the date the installation was made in 1917 until he sold the house. The testimony does not show that Exhibit C ever operated to provide safety in any particular instance, but, on the contrary, that constant trouble was had with Exhibit C. Mr. Sheppard must be in error, when he says Exhibit C is the original one, because he said that the first oven regulator was borrowed from Mr. Christian's stove and the testimony shows that this regulator was returned, and another regulator bought from the Atherton Furnace Company, and substituted in the Sheppard installation. It further appears that these thermostats, from time to time, burn out. Mr. Sheppard sold the house and disconnected the control, because of the trouble he had in the burning out of the thermostats. After the sale of the house, the burner was without the benefit of Exhibit C. The testimony shows that the burners of said alleged public use and of the Sherman and Sheppard Patent, would run and could be used without devices like Exhibit C, and without the benefit of safety factors.

I am not convinced that Exhibit C ever afforded any protection on an oil burner system, and the testimony of Christian at St. Louis and Worcester, which is supposed to corroborate Mr. Sheppard, does not, in any respect, change my opinion. The testimony shows that oil burners were put in five places, other than William H. Sheppard's home, towit: John A. Sherman's, Frank White's, Jewett Greenhouses, J. Edward Sherman's and McCullom's, and we will consider with care the defendant's testimony concerning the use of Exhibit I, as part of any such system. Sheppard testified that an installation was made at the home of John A. Sherman in January 1918 where they first tried a glass thermostat, but because the heat kept breaking it, they went to Exhibit I. He further said the burner is now running, but without controls

and that he does not know just when they were discarded. He said Honeywell controls were later put into it, but that he did not know when. Christian testified that the John A. Sherman installation continued in operation about two years, but he did not say that he saw the device like Exhibit I work, whether it ever did work, or how long it stayed in use, in that installation. Mr. Sheppard next said an installation, the same as John A. Sherman's was made for Frank White in the spring of 1918, which ran until May, 1920. Mr. Sheppard further said he last saw the White installation "probably a few months or a year after it was put in". Sheppard says the White installation was identical with Sherman and Sheppard, (Exhibit NNN, page 219), but he does not say positively that the White installation had any device like Exhibit I, or if it did, if it ever worked. Mr. Sheppard says that Jewett Greenhouse with two burners, were like the others, but in neither of the pictures of the Jewett Greenhouse (Exhibits N and GGG) is there shown the construction of Exhibit I. There is no testimony that anyone saw any safety work on the Jewett installation.

As to the J. Edward Sherman installation, Mr. Christian was not quite certain that Exhibit I was from that installation. He says J. Edward Sherman changed the parts quite often, that the last one was taken off, but that he did not know when Exhibit I was taken off, or who took it off. He did not testify as to how long it worked, whether it ever did work, or how long it was on. He says that the installation is still running, but does not have Exhibit I, but the J. Edward Sherman installation was changed to Honeywell controls. Mr. J. Edward Sherman was called as a witness, but he did not testify that Exhibit I ever operated to give safety.

Exhibit P, offered in evidence by the defendant, shows the wire leading to the insulated post, but it does not show any ground wire, and without a ground wire for grounding the circuit somewhere, the safety device would not work, therefore, the indication is, that in the spring of 1919, the switch, Exhibit I, was not connected up.

As to the installation of McCullom, Mr. Sheppard did not know whether the safety on McCullom's device ever worked, nor did he say positively that McCullom had a device like Exhibit I. He did say that he had not seen the McCullom device since it

was first put in. Christian said McCullom had a door like Exhibit I, but that he did not believe that McCullom had that control.

From a consideration of all of the testimony, as to the installations aforesaid, the evidence convinces me that neither Exhibits C or I ever operated satisfactorily as safety devices after they were installed. From the testimony it appears that they continually gave trouble and did not work, and it is of interest to note that in the application for the Sherman and Sheppard patent, no details of Exhibit C or Exhibit I, appear. Surely, if they had successfully accomplished the purpose of safety device, they would not have been discarded when Sherman and Sheppard made their application for their patent.

While it is undoubtedly true that Sherman and Sheppard made installations of oil burners at the places stated, and attempted to provide those oil burners with a safety control, it clearly appears to me that, at most, the attempted use of Exhibits C and I, was experimental, and that they were abandoned as unsuccessful experiments. Without going into a lengthy discussion of the reasons, it seems clear to me that neither the Sherman and Sheppard Patent No. 1,523,564 nor the alleged prior uses, anticipated the Aldrich Patent in suit, in that, they did not provide the kind of safety device provided by Aldrich.

■ The Aldrich Patent in suit shows invention over both Sherman and Sheppard Patent and the alleged prior uses.

Williams' prior uses, that is, the alleged prior use by Williams Oil-O-Matic Company of Bloomington, Illinois, is urged against Scott Reissue No. 17,405 in suit, and Aldrich No. 1,579,497. The particular type of switch alleged to have been used, is shown in Exhibit BB.

Exhibits 5 and 6 taken together are a full disclosure of the structure and the claims of the patent in suit.

The complete subject matter of the claims in suit was shown by Aldrich as early as June 25th, 1923, and a particular combustion switch, which meets the claims so far as they relate to the details of the combustion switch, was shown as early as April 15th, 1923.

It hardly seems necessary to go over the testimony of each of the witnesses, called by the defendant, to prove the Williams' prior uses, as it seems clear to me, that none of the witnesses, called on behalf of the defendant, fixed any date which would carry this use prior to the dates which I have assigned to Aldrich, as the dates of his invention. Furthermore, although Williams had an application for a patent on the specific switch mentioned by the witness, Nesmith, which he now says antidates Aldrich, he let the case go by default, which would indicate to me that he was not able to establish dates early enough to antidate Aldrich. Reading all of Nesmith's testimony, it does not show that Williams had the switch of Exhibit BB prior to the date, 1934, of Exhibit O O.

Casey, another witness called by defendant, was unable to fix any dates as to the time when Exhibit B B was made, and he gave no testimony as to any tests or installations.

Stockdale, another witness called by defendant, gave no dates when switches L L and K K, which have a slip connection, were made, tested or used.

The witness, Moore, gave no testimony as to dates.

The witness, Price, testified at great length, and the best that he could do in producing records relating to the slip connection in 1923, was to produce the 1924 booklet, Exhibit O O. He did not show any successful installation, or use, of the combination of the Aldrich Patent, at any time.

Ellerbrock, was a witness called by defendant, who was in charge of records. He gave testimony with reference to a nickel tube instead of a brass tube, but this, he says, was in the spring of 1923, and he did not recall any stack safeties made for use in the field before that time. He first looked up records relating to the slip connection switch in 1924, and he found nothing earlier than the spring of 1923. He produced Bulletin 72 Exhibit EEE dated June 6th, 1923, which said that all future shipments would include the improved safety control, and it is to be noted that the letter, which formed part of Exhibit EEE is dated more than a month after Aldrich filed his application for Patent No. 1,893,875.

I cannot find any testimony which conclusively shows that Williams had the slip connection switch, prior to Aldrich's filing dated April 16th, 1923, for his patent in suit, nor that any of these switches, at any specific time, or any specific installation, were ever installed in a combination like that of the Aldrich Patent in suit. The

testimony of the defendant's witnesses offered in support of the alleged Williams' prior art required to prove anticipation, that is, it is not clear and convincing. The alleged Williams' prior use is not an anticipation, and the Aldrich patent shows invention over it.

### Scott Patent No. 1,602,175

Scott provides an automatic electrical control system for oil burners in which a low voltage electrically-controlled relay closes a burner motor circuit when energized and holds it closed only so long as the relay remains energized and further provides low voltage controlled circuits for his relay, including an initial energizing circuit, and a combustion switch controlled maintaining circuit. By using low voltage parallel initiating and maintaining circuits for his relay, one of which circuits included the combustion switch, Scott was able to use the very desirable normally open combustion switch, which closed upon the establishment of combustion. This arrangement caused the burner to stop whenever the maintaining circuit for relay is interrupted, regardless of the cause. This was not found in the prior art. When the system is in identical position, there is a high voltage circuit to the transformer primary. The closing of the room thermostat completes a circuit that energizes a safety switch heater 42, and also closes the initiating circuit for the relay 43. This circuit, going from the left-hand side of the transformer secondary, through the thermal element 38, the ignition and safety switches 41–36–37, the relay coil 43, and back to the transformer secondary. The energization of the relay coil 43 closes the motor switch 2 to complete a high voltage motor circuit.

When the room thermostat calls for heat, it also closes an ignition circuit. If the system operates normally and combustion is established, the combustion switch moves from its normally open to its closed position, whereby there is established a circuit from the left-hand side of the transformer primary, through the combustion switch and through a switch 15, which was closed when the motor switch closed and through the coil 43, room thermostat 33 and back to the transformer secondary. Thereafter the heat from the heater coil 42 warps the bimetal thermostat member 38 to cause it to separate the safety switch contacts. This breaks the initiating circuit through coil 43 but leaves the main-

taining circuit through that coil. A further warping movement of the member 38 opens the ignition switch, and breaks the ignition circuit. When the room thermostat is satisfied, it opens. If no combustion occurs, the combustion switch stays open. The heater 42 wraps the bimetal thermal member 38, causing it to open the safety switch and ultimately the ignition switch. When the safety switch opens, the initiating circuit through the coil 43 is broken, and the motor switch opens. If the room thermostat closes, and establishes the initiating circuit and other circuits, and combustion is established, thus closing the combustion switch and establishing the maintaining circuit, and the safety switch heater opens the safety switch and breaks the initiating circuit so that the burner is in running position and thereafter combustion fails, causing the combustion switch to cool and open, the maintaining circuit will be broken. The energization of the coil 43 will result in the opening of the motor switch and the stopping of the burner. One of the great advantages of the Scott Patent 1,602,175 in suit, is that the initiating and maintaining circuit is provided with a normally open combustion switch. If his combustion switch burns off, the system cannot be operated normally until the defect has been found, and cured. Safety does not depend upon closing a switch.

As we have already discussed the prior patents at length, we will briefly compare Scott Patent 1,602,175 in suit, with the prior art, urged by the defendant.

Watts Patent No. 489,052. In that patent are not found the following features; of the Scott Patent in suit: high and low voltage arrangement of circuits; burner, motor and fan; means for electrically-controlling the burner motor; automatic ignition; initiating circuit in low voltage controlled from a room thermostat and including an electrically-controlled device (magnet) for controlling the switch in the high voltage circuit; maintaining circuit including the magnet or relay and switch subject to combustion conditions; any provision for protection in case of combustion failure.

Doble Patents Nos. 1,131,683; 1,332,615; 1,359,042. These patents do not show the following features of the Scott Patent in suit: anything corresponding to a room thermostat; arrangement of a motor in high voltage and controlled device in low

voltage circuits; low voltage initiating circuit, including a magnet relay for operating a motor switch; low voltage maintaining circuit, including the relay and a normally open switch subject to combustion conditons; provision for protection in case of combustion failure.

Welch Patent No. 1,183,786. That patent does not have the following features found in the Scott Patent in suit: it is not automatic; has not got a high voltage controlled from a low voltage circuit; has no initiating circuit, including the relay for operating the switch in a motor circuit; has no maintaining circuit, including a relay and a normally open switch, subject to combustion conditions, arranged to cooperate with the other parts for affording the ample protection in case of combustion failure.

Fesler No. 1,117,652. Fesler does not have the following features of the Scott Patent in suit: room thermostat, and has not an automatic system; high voltage-low voltage arrangement for affording automatic operation and protection; protection against initial flame failure and only partial protection against subsequent flame failure; initiating circuit with a relay therein to operate a switch in the motor circuit; maintaining circuit that has a relay therein and including a combustion switch operating to close upon establishment of combustion; the combustion switch open, when cool, to afford protection, and closed, when hot, to close the maintaining circuit.

Elliott Patent No. 1,371,231. That patent provides inferior kind of protection by means of a drip bucket system. That patent differs from the Scott Patent in suit, in the following particulars. If the fuel supply should give out, the motor would keep on running indefinitely. It has no low voltage initiating circuit drawn from the main circuit, including a relay for operating a switch in the main circuit; no maintaining circuit with the combustion switch, and including the relay, and no combustion switch at all.

Hunt Patent No. 1,441,928. That patent does not disclose any thermal type switch subject directly to combustion conditions. It does not afford protection against combustion failure, but merely has a high limit control for shutting down the motor in case the temperature in the hot water jacket gets too high. Hunt patent shows nothing like Scott's initiating and maintaining circuit with Scott's organization of the parts therein.

Garvey Patent No. 1,410,909. That patent shows a drip bucket type of control with a very sketchy, inaccurate and incomplete disclosure of an electrical mechanism. No source of electrical energy for his motor circuit is shown, and neither does he show a switch subject to combustion conditions, nor a normally open combustion switch. No arrangement of initiating and maintaining circuits like Scott's, with Scott's organization of parts therein, is shown.

Jacobsen Patent No. 1,432,464. That patent shows an automobile burner started and stopped by hand. It is not equipped with a thermostat or any circuit controlled therefrom. Jacobsen provides a diaphragm 25 subject to pressure in his boiler which shuts off the oil supply, if the pressure gets too high, and lets it come on again when the pressure runs down. Jacobsen shows no combustion switch normally open or otherwise, nor anything like Scott's initiating and maintaining circuit combination, nor any protection in case of combustion failure.

Wales Patent No. 1,393,654. That patent does not show any switches subject to combustion in the combustion chamber, but does show switches subject to the heat of pilots. That patent does not afford protection against failure of combustion in the furnace, nor does it show anything similar to Scott's initiating circuit including a relay for closing the switch in the main motor circuit, nor does it show a heater adapted to stop the motor, after a time, if combustion is not established. Further, it does not show any maintaining circuit including a relay and a thermal element switch, subject to combustion, which is normally open and closes upon combustion.

Haas Patent No. 1,476,201. The device of that patent is intended to afford protection against combustion failure, but does not accomplish that result. In Haas, if the room thermostat is calling for heat, and combustion fails, 30 will move away from 29, and thus effect the breaking of the circuit through the magnet 18 and open the motor circuit. If the room thermostat continues to call for heat, then, just as soon as the thermal element 29 cools down, the circuit through the magnet 18 will be closed again, and the motor will be started up, and the device will continue to thus cycle as long as the room thermostat

calls for heat. This might flood the burner, and open the re-establishment of combustion, and result in an explosion. Haas has a combustion switch, but it does not establish a relay maintaining circuit when combustion occurs. The combustion thermostat in Haas is normally closed, and stays closed, at all times, during normal operation. The systems of Haas and Scott do not have the same arrangement of parts, nor the manner of functioning.

Jeidel British Patent No. 3,818 A. D. 1914. That patent does not show the electrical system of Scott.

Scott Patent No. 1,320,936. The same inventor took out that patent that took out the patent in suit, and while they relate to the same general type of problems, and have some features of similarity, they differ materially in the construction and arrangement of the two devices. In the Scott reference patent, when the room thermostat closes, it directly establishes a high voltage motor circuit in each of Figures 1 and 3, but there are no low voltage controls or safety circuits, nor are there any initiating and maintaining circuits. In both Figure 1 and Figure 3, of the Scott reference patent, the switches alleged to be controlled by combustion conditions, are opened when the burner is idle, and remains open, if combustion is established, but closure of these switches places the Figures 1 and 3 on safety. In the Scott patent in suit, the combustion switch is normally open and must close to maintain the burners in operation, and open to afford safety, and that the switch opens to cause a safety cut-out of the motor circuit, and gives greater safety, than the Scott reference patent, which must close a switch to give safety. There is not found any initiating and maintaining circuits in the Scott reference patent, through a relay, for keeping a switch closed, in the high voltage motor circuit.

Sherman and Sheppard Patent No. 1,523,564. That patent shows no connection between the combustion switch circuit and the controlling circuit which starts and stops the motor. The closing of the room thermostat closes a circuit through the magnet coil 23 which effects the closing of the circuit through the motor. Both these circuits are high voltage. The motor switch will then remain closed, even though the magnet coil 23 be deenergized, and until the magnet 15 is energized.

The establishment of combustion in Sherman and Sheppard presumably opens the so-called combustion switch contacts. It does not set up a maintaining circuit for the motor switch closing coil. Sherman and Sheppard have no such co-operative arrangement as is found in the Scott patent in suit, therefore, if anything happens to the combustion switch or its circuit, in the Sherman and Sheppard system, the system is left without protection and the householder has no warning as the combustion switch system can operate under all the hazards of combustion failure.

Sherman and Sheppard do not anticipate nor teach the way to Scott No. 1,602,175.

While it is true that there are elements of the patent in suit as to which the alleged prior art patent is offered, none of the alleged prior art patents, nor the alleged prior uses, anticipate any of the patents in suit.

Each of the patents in suit represents an advance in the art and shows a distinct advance over the prior art and is valid.

Aggregation. This defense was pleaded against all of the patents in suit, but nothing was said in defendant's opening nor was there any discussion of that defense by defendant's expert, and that defense is dismissed.

Defense—That reissue of Scott Reissue was improper. That defense was pleaded in the complaint but the defendant said nothing about that defense in the opening statement, nor was anything said in support of that defense by defendant's expert.

Defense of intervening rights as against Scott Reissue 17,405.

This defense was likewise pleaded, but no evidence was offered in support of it.

This brings us to a consideration of the question of infringement.

Exhibit 18 shows the structure and sequence of operation of defendant's device, and is made in accordance with the stipulated drawings, Exhibit 7. It has a motor and the blower and fuel pump operated thereby. At the left of the fuel pump is the spark plug ignition device. Ordinarily, the main line high voltage wires are connected in circuit with a closed safety switch and a transformer primary. When the room thermostat calls for heat, and closes its contacts, there is a closed circuit through the room thermostat, a trans-

former secondary and a safety switch heater. The transformer secondary is arranged in such relation, to the transformer primary, as to provide a repulsion type relay and when the transformer secondary is energized upon the closing of the room thermostat, it is repulsed and moved upwardly. It is mounted on an arm, which also carries the motor switch so that the upward movement of the transformer secondary mechanically moves the motor switch from its open position to its closed position. The closing of the motor switch closes the motor circuit from the left-hand end of the transformer primary through the motor switch and thence through the motor and back to the incoming current line. There is a parallel circuit through the normally closed ignition switch, and through an "ignition coil". From that "ignition coil" the spark plug or electrode type igniter is operated. When the room thermostat closes, there is completed a low voltage initiating circuit through the transformery secondary, and the safety switch heater.

The repulsion of the transformer secondary closes a high voltage circuit through the motor and ignition switch. The repulsion of the transformer secondary closes a high voltage circuit through the motor and the ignition switch. In normal operation, when the motor operates the pump, and the blower and the ignition is working properly, combustion occurs. Combustion heats the thermal element in the stack. The thermal element warps and the effect thereof is to rock the ignition switch to open position and likewise to rock the combustion switch. Thereupon, a maintaining circuit is established from the transformer secondary through the room thermostat, the combustion switch and back to the transformer secondary, whereby the motor switch is maintained in closed position when this maintaining circuit is established, the safety switch heater is ineffective to stop burner operation. In normal operation, when the room thermostat is satisfied, it opens. This breaks the circuit to the transformer secondary and, of course, breaks the circuit through the combustion switch. When the transformer secondary is no longer energized, it is no longer repulsed by the transformer primary and drops from its raised position to its lowered position. The effect of this dropping is to move the motor switch mechanically from its closed position to its open position. When the motor switch opens, the circuit through the motor is broken and the parts return to their original idle position.

Safety operation in the event of initial combustion failure is provided by the defendant in this manner. When the defendant's system calls for heat, the room thermostat closes, the motor switch closes, and the parts are in their positions and combustion does not occur, the thermal element in the stack does nothing, and the combustion switch remains unchanged in the normally open position. This leaves a circuit through the safety switch heater. The safety switch heater is adjacent a bimetal thermal latch, which normally holds up the pivoted safety switch. The bimetal safety switch latch begins to warp and the heating and warping of the safety switch latch continues until the latch releases the safety switch, which then drops to its position, with the effect of breaking the main line circuit and thus cutting out the motor and the transformer primary as well as the secondary.

The defendant provides for subsequent combustion failure.

If the defendant's room thermostat calls for heat and combustion is established in the normal way, and the parts come to their normal running position, then combustion failure occurs, because of a slug of water in the oil line, or for any other cause. The thermal element in the stack cools down. The combustion switch moves from its closed position to its open position. However, a mechanical latch arrangement holds the ignition switch open. The full current is then re-established through the safety switch heater which starts to warp out the safety switch latch and as this warping movement continues, the safety switch latch permits the safety switch to drop, breaking the circuit to the transformer primary and motor. When the transformer secondary drops down because of interruption of various circuits by opening of the safety switch, the mechanical latching means is released and the ignition switch returns to closed position.

The combustion switch is associated with its thermal element in such a manner that it closes and opens substantially immediately upon initial rise and fall in combustion temperature. After the safety operation, the safety switch must be returned to its closed position, after the safety switch latch cools off. The defendant's structure is embodied in an installation made at the Marcus home, Exhibit 18.

Comparing the Marcus installation with the Scott Patent in suit Scott Re. 17,405, we find that the two structures are alike. In each there is an oil burner with a spark plug type ignition, and an electric motor operating a pump, and a blower. There is provided a room thermostat in each room which calls for heat and closes a circuit through a relay device, which, when energized, closes the main motor circuit.

The electrical energy in both cases is received from a transformer secondary.

In Scott, the transformer secondary and the relay which operates the motor switch are separated.

In Marcus, they are closely related to type of repulsion relay which as such is old.

Before considering the claims in suit of the patents specifically, it is well to repeat that they were not pioneers, but that, however, does not deprive them of the right to the use of equivalents, but they are limited in their use to the protection of the invention they have made.

I will now consider the patents in the order in which they have heretofore been considered.

Scott Reissue Patent No. 17,405 of which Claims 12, 14, 16, 17, and 21 are in suit. Claim 12, reads as follows: "12. In an oil burning system, electrically operated means for projecting fuel into a zone of ignition, means for igniting the fuel, a high voltage circuit including said fuel projecting means, a low voltage circuit, an electrically controlled device in said low voltage circuit for making and breaking the circuit of said fuel projecting means, a safety device cooperating with the electrically operated means directly responsive to and regulated by combustion conditions, said safety device operating upon failure of combustion, to stop the electrically operated means."

The Mercoid Corporation is the manufacturer of the Pyratherm, one of the control instruments forming part of the defendant's installation. It is adapted for oil burners employing intermittent spark or gas ignition. Defendant's motor pump and blower project fuel into a zone of ignition, and defendant has a spark type igniter. Defendant also has "a high voltage circuit including said fuel projecting means". Such a circuit is shown through the safety switch, the motor switch and the motor. There is also shown "a low voltage circuit"

which would be any circuit starting from the transformer secondary. Defendant also shows "an electrically controlled device in said low voltage circuit for making and breaking the circuit of said fuel projecting means". This, as I find it in the defendant's structure, is the "transformer relay" of which the secondary is in the low voltage circuit for making and breaking the circuit to the motor.

Defendant also has a combustion switch directly responsive to and regulated by combustion conditions to stop the motor upon failure of combustion, which follows the requirements of the patent for a safety device from which, it appears to me, that defendant had the exact combination of claim 12, and defendant relies upon the fact that it does not have the "electrically controlled device in said low voltage circuit for making and breaking the circuit of said fuel projecting means" of claims 12 and 17, nor the magnet switch of claims 14 and 15 (electro magnets A–B), but uses, instead, its transformer repulsion relay.

I cannot see how the defendant can escape infringement by providing a magnetic relay, which, when energized, repulses the switch member over an electro magnet relay, which, when energized, attracts the switch member.

The motivating force in both cases is the electrical energy or magnetism that determines movement of a part of the relay, which movement causes the main switch to be closed.

 Scott, as we have found, made an invention in his patent, and that invention is entitled to protection, regardless of the fact that he was not a pioneer and, therefore, it seems to me that the defendant's magnetic relay, which, when energized, repulses the switch member, is the commonest kind of an equivalent.

Claim 14 is like claim 12, except that it calls for a magnet switch in the low voltage circuit instead of calling for an electrically-controlled device as in claim 12, and the opinion I expressed there, as to defendant having the exact combination of claim 12, has not been changed by the argument made in support of defendant's contention that it does not infringe.

I can see no patentable difference in defendant's use of the magnet switch as the transformer repulsion relay in which magnetization causes the transformer secondary to move bodily away from the

transformer primary and closes the motor switch, over the requirements of the patent, because it is certain that magnetic repulsion moves the secondary coil upward and closes the Mercoid switch circuit, whereas, in the patent in suit, the secondary reacts against the magnetization, and moves upward. This, it seems to me, in so far as the Mercoid switch circuit is concerned, is shown in the Mercoid, 1936 Catalogue, Exhibit 22. Defendant's expert does not agree with the statement in the Mercoid Catalogue, but I am convinced that the defendant has a magnet switch which is caused to operate by magnetic repulsion. I see nothing in the claim which limits it to repulsion or retraction. What it calls for is a magnet switch, and defendant has it.

Claim 16. This claim is like claim 14, except that claim 16 provides that the safety device (combustion switch) cooperates with the "magnet switch", and that the safety device operates upon failure of combustion to stop the electrically operated means. Only when the secondary of the transformer relay is energized can the combustion switch be operative, whereas claim 14 provides that the safety device (combustion switch) cooperates with the electrically-operated means (motor).

Claim 17. This claim is like claim 12, with the exception that is includes as part of the safety means "a device adapted to be brought into action when the circuit is closed to the electrically-operated means", and as another part, "a cooperating device," which is the combustion switch.

These devices are shown in the defendant's structure, as the safety switch heater, which is brought into operation instantly upon the energizing of the secondary transformer and the combustion switch. The combustion switch, as shown in defendant's structure, cooperates with the safety switch heater by leaving it in the circuit during the starting period, shunting it out during normal operation, and putting it back in circuit upon combustion failure.

Claim 21. This claim differs somewhat from the other claims in suit, and I will discuss them.

The defendant's structure, as is that of the patent in suit, is an oil burner for heating a furnace. The defendant's motor, which operates the pump and blower, fulfills the requirement of the patent in suit, for "means for projecting sprayed fuel in-

to a zone of ignition" and defendant has an electric igniter as its means for igniting the fuel. The defendant has a thermal element arranged in the stack to receive heat when the burner is operating, which heat must be relatively small, when compared with the heat of the flame. This is also in accord with the requirement of the patent. That in the defendant's structure, the thermostat is so located, that when the oil burner stops, cool air from the room will be drawn over said thermostat, seems to me to be clearly shown, by the instruction sheet of the Mercoid Corporation, Exhibit GGGG, and the physical device, Exhibit 8. The defendant makes a point of what is shown on Exhibit GGGG and marked "6 Air Vent". The defendant's expert contends that the purpose of this air vent was to let oil out in case of back-firing, but whether that be one of its purposes does not prevent its also being used to allow a draft of cool air to be drawn from the room directly into the stack immediately and directly over the spiral thermal member. Undoubtedly, such a draft of cool air directly against the thermal member would have the effect of causing it to cool down faster when the burner stops, than it would if no such air vent existed. This claim was obviously drawn to cause a cooling of the thermal member when the burner stops and I can not agree with defendant's expert, that it would not have much effect, because of the large volume of air in the stack. On the contrary, it seems to me that such vent brings the defendant's structure within the requirement of claim 21. Defendant's structure has an electric heater, which is associated with the combustion thermostat, by means of the shunt circuit, and this, it seems to me, satisfies the requirement of the claim for "means associated with said thermostat and rendered operative thereby upon projection of said fuel without ignition to render inoperative said fuel projecting means".

### Aldrich Patent No. 1,579,497

Claim 1 of that patent reads as follows: "1. A fuel burning device comprising means for projecting a fuel mixture into a zone of ignition, a combustion chamber, an electrical safety control mechanism for preventing the projection of the fuel mixture upon an initial failure of ignition or a failure of combustion conditions thereafter, said safety control mechanism comprising a switch including a movable contact member, a thermal member sensitive

to combustion conditions for controlling the movement of said member, and a slip connection between the thermal member and the movable contact member for substantially immediately actuating the movable contact member upon initial movement of the thermal member in either direction."

Defendant has a motor pump and blower and a combustion chamber. The defendant has a switch of the mercury type which moves up and down for making and breaking a circuit. Whether the movable contact be the mercury or the electrodes the defendant's structure has a contact member included in a safety control mechanism that operates upon initial failure of ignition or subsequent failure of combustion by stopping the motor. The spiral thermal element of Exhibit 18 projects into the stack and serves to control the movement of the contact member. In defendant's structure, a slip connection is provided by a ratchet mechanism between its thermal member and the movable contact and of the thermal element whereby the movement of the thermal element in either direction operates the switch contact.

Defendant cannot escape infringement, because it does not use the identical Aldrich disclosure of its ratchet slip connection, because it seems clear to me that the ratchet wheel and teethed structure is an equivalent, and however narrowly you may construe the Aldrich Patent, that would still be an equivalent, necessary to protect the invention of Aldrich. Even if it should be found that the defendant made a new invention in its ratchet wheel connection, that would not relieve from infringement, whereas, as here shown, the defendant has taken all of Aldrich's presentations and has perhaps improved upon them.

 I do not say that the defendant has not made an improvement upon Aldrich, but I do say that he has taken Aldrich's invention, and this constitutes infringement.

Defendant cannot escape infringement by varying the Aldrich disclosure and urging that it does not have Aldrich's normally closed combustion switch, nor an electromagnet, which, when energized, breaks the motor circuit, because Aldrich did not limit himself to these details as such in his claims. In making its structure, it selected parts to make its combination and many were open to it, but it does not seem

to me that defendant can escape infringement by opening a switch by an electromagnet that pulls the arm, or by one that pushes the switch member, or a magnet that pushes the switch member, as does Aldrich.

We must not lose site of the fact that the combination of Aldrich consisted of many elements that were old, and that the defendant, in making its structure, has a right to avail itself of old elements, but it has not the right to put them together in the way that Aldrich found of combining them and thereby avail itself of the Aldrich invention, as the selection of slightly different elements to those used in the Aldrich combination, especially where he did not limit himself to the details as such in his claims, does not avoid infringement.

Claim 2. Substantially the only difference between claim 1 and claim 2 is that claim 2 provides for preventing the projection of fuel upon initial failure, whereas claim 1 relates to initial and subsequent failure, and what I have said with reference to this subject in my discussion of claim 1, applies equally here, and no further discussion is required as to that particular question.

Claim 3. This claim differs from claim 1, in that claim 3 calls for the movable member, and claim 1 calls for a switch including a movable member, and claim 3 calls for the connection between the movable member and the thermal member a "yielding connection" instead of, as it is called in claim 1, "a slip connection".

The first differentation requires no further consideration.

As to the second, there is a yielding connection such as causes the dog to ride with the teeth for a certain distance, but when the stop is engaged, the dog will be yieldingly pushed out of the notch between the teeth, and then will drop back into the next notch, that is, a yielding connection called for by claim 3.

Claim 4. This claim differs from claim 1, by calling for "separable contacts controlling the circuit, a movable member adapted to control the electrical circuit through said contacts, a thermal element sensitive to combustion conditions actuating said movable member", instead of calling, as in claim 1, for a thermal member, a movable contact and a slip connection between them. In defendant's structure, the movable member is the switch plate which supports the switch element.

1008

Claim 5. This claim differs from claim 4 in that it includes that the movable member is a contact member, that is, the movable member carries one of the separable contacts.

Scott Patent No. 1,602,175

Claim 2 of the patent reads as follows: "2. In an electric control system for oil burners, in combination with electrically-operated means for initiating and maintaining combustion, a safety-device for controlling the operation of said electrically-operated means comprising an electric circuit including said electrically-operated means, an automatic device controlling the operation of said electrically-operated means which is normally in position to permit the starting thereof, an automatic safety switch responsive to combustion conditions for controlling the operation of said electrically-operated means and maintaining the circuit thereto during the running period of said electrically-operated means, said automatic safety switch being adapted to co-operate, when closed, with said automatic device to permit the burner to continue to operate if combustion takes place, and, when open, to shut off the burner when there is no combustion, said automatic safety switch being normally open and operating upon the establishment of combustion to close, whereby upon the failure of combustion, the failure of said switch to close will permit the automatic device to render said electrically-operated means inoperative."

Comparing the defendant's structure with Scott Patent No. 1,602,175 in suit, we find as follows:

In the defendant's structure the electrically-operated means in the relay which, when the transformer secondary is energized, closes the motor circuit, which is through the transformer secondary, room thermostat and safety switch heater. The safety switch heater, the safety switch latch and the safety switch constitute the automatic device in defendant's structure. The defendant's combustion switch closes the maintaining circuit through the secondary of the transformer during the running period. When closed, the defendant's combustion switch co-operates with the safety switch heater to render it inoperative, and to permit the burner to continue to operate, if combustion takes place. When there is no combustion, and the combustion switch is open in the defendant's structure, the burner is shut off. The normal position of defendant's combustion switch is open, and it closes upon the establishment of combustion. Upon the failure of combustion, in the defendant's structure, the combustion switch will fail to close, permitting the automatic device, namely the safety switch heater, safety switch latch, and safety switch, to break the main circuit, and render the complete system inoperative.

Claim 6. For the electrically-operated means for initiating and maintaining combustion as called for by the patent the defendant has a relay and for its safety device a circuit through the secondary of the relay. The defendant also shows an electrically-heated thermostatic safety switch device, as the electrically-heated thermostatic device of the patent. The defendant's combustion switch is the automatic switch in the electric circuit of the patent, and the purpose and function of defendant's combustion switch is, "either to permit the burner to continue to operate if combustion takes place, or to shut off the burner if there is no combustion". The automatic switch of the patent being normally open, and operating upon the establishment of combustion to close, and so does the combustion switch of the defendant. The failure of the combustion switch, in defendant's device, to close permits the safety switch latch to open the safety latch to open the safety switch, and break the main circuit, thus rendering the entire system inoperative. The claims in suit, of each of the patents in suit, read upon the defendant's device, in spirit, and in fact, and where an equivalent is found, it is one clearly within the invention disclosed in the particular patent in suit, and necessary to protect the inventions of that patent.

Defendant does not avoid infringement by showing that details of elements of any claim of any of the patents in suit and in defendant's device may differ, nor is it necessary to enumerate them, and this is especially true where no mention of such element is found in the claims.

Examination of the prior art convinced me that all the defendant was able to do was to show that one element here, and one element there, of one of the patents in suit, might be found in a patent of the prior art, but not in the same combination as in the patent in suit. I did not find in the prior art any limitations of any of the claims of any of the patents in suit which relieved the defendant from infringement.

The defendant, in argument, places much reliance on the decision in Electrol, Inc., of Missouri v. Merrell & Co., Inc. et al., 8 Cir., 39 F.2d 873, and introduced page 881 of the Federal Reporter in that case, as Exhibit H.H.H.H. Defendant's purpose was to show that a federal device was put out by the Mercoid Corporation's predecessor, and was held by the Eighth Circuit not to be an infringement of Scott 1,602,175. That decision, as I read it, based its determination on the finding that there are in defendant's mechanism, no co-operating devices in different control circuits. There are no control circuits in defendant's second form mechanism; but there are two high voltage motor circuits. There is no magnet in a control circuit which, when energized, closes the motor circuit.

Subsequent to the decision in the Electrol case, Mercoid Corporation has put into its controls the features found by the court to be absent from the federal control, which distinguished the federal control from the Scott Patent in suit, No. 1,602,175.

The present device embodying the control as now made by Mercoid has all of the features of the Scott Patent in suit, No. 1,602,-175, and cannot avoid infringement.

The defendant infringes each of the claims in suit of the patents in suit.

We now come to the motion made by the defendant to dismiss as to the Aldrich patent based upon Rule 41 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, so much of which as is necessary for consideration herein reads as follows: "Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim."

These Rules became effective on September 16th, 1938, and so much of Rule 86 as is necessary for consideration herein, reads as follows: "They govern all proceedings in actions * * * then pending, except to the extent that in the opinion of the court their application in a particular action pending when the rules take effect would not be feasible or would work injustice, in which event the former procedure applies."

It is alleged that plaintiff brought suit against William W. Stuart in Iowa for infringement of the Aldrich Patent in suit, and dismissed it without prejudice on May 6th, 1935.

Also, it is alleged that plaintiff also brought suit against Osher & Reiss, a co-partnership, for infringement of the Aldrich Patent and dismissed that suit without prejudice about July 2nd, 1937.

It seems unnecessary to go into any discussion of whether the cases dismissed were for the same cause of action, because there can not be a dismissal on the merits unless subsequent to the date the rule went into effect a notice of dismissal was given.

The prior dismissals gave the opportunity to make the rule effective, if, subsequent to the effective date of the Rule, the notice was given. This does not change the effect of the action of the plaintiff in dismissing the action prior to the effective date of the rule, but would make the notice given subsequent to the effective date of the rule a voluntary action on the part of the moving party, with notice, on which the rule would be applied.

No notice of dismissal after the rule went into effect was given, but the action was brought on for trial and that motion is denied.

The motion to withdraw the Frenier Patent No. 1,379,008, one of the patents on which this suit was originally brought, was made by the plaintiff, at the opening of the trial, but on the objection of the defendant, was left in the case until it was concluded to prevent any technical loss of the defendant's right to protect its counterclaim.

Plaintiff offered no evidence in support of the Frenier Patent.

The defendant asks that the suit be dismissed as to the Frenier Patent on the merits.

What I have said as to Rule 41, supra, and Rule 86, supra, of the Rules of Civil Procedure, need not be repeated, as it is equally applicable here, except that the conditions here existing are exactly the opposite of those in the Aldrich motion.

The purpose of Rule 41 was to prevent the delays in litigations by numerous dismissals without prejudice. Prior to the time when the rules went into effect, there had been dismissals without prejudice on motion of the plaintiff, an action based on or including the same claim in the Frenier Patent in suit having been so dismissed. These dismissals did not on the rule taking effect cause a dismissal on the merits, but

actions based on or including the same claim having been dismissed without prejudice on the plaintiff's motion before the rule went into effect, the motion subsequently made on the trial of this case by plaintiff is and must be considered as made under and covered by Rule 41 supra.

The motion for.leave to withdraw or dismiss, made by the plaintiff in this case as to the claims alleged in this suit as to the Frenier Patent No. 1,379,008 is granted, but is so granted as an adjudication on the merits.

The first counterclaim of the defendant for a declaratory judgment holding the patents in suit invalid and for other relief requires but little further consideration, as I have held on the facts and the law that such patents were valid and infringed.

Defendant's first counterclaim is disallowed and dismissed on the merits.

Each of the claims in suit of each of the patents in suit, except the Frenier Patent No. 1,379,008, is valid and infringed, and the said claims in suit of said patents in suit represent invention over the prior art.

A decree may be entered in favor of the plaintiff against the defendant, with injunction, and three-fourth costs, and the usual order of reference, and dismissing the motion of the defendant for an order dismissing the Aldrich Patent No. 1,579,497 and disallowing and dismissing the defendant's first and second counterclaims and in favor of the defendant against the plaintiff, dismissing the claims which were in suit of the Frenier Patent No. 1,379,008, which was in suit as an adjudication on the merits.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion for the assistance of the court as required by the Rules of Civil Procedure, and the Civil Rules of this court.